**Jess T. SIMPSON, former President and Chairman of the Board of Directors, Cascade Savings Bank, Everett, Washington, Petitioner,**

v.

**OFFICE OF THRIFT SUPERVISION, Respondent.**

**Nos. 92–70797, 93–70050.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 1994.

Decided July 18, 1994.

---

Jonathan B. Noll, Foster Pepper & Shefelman, Seattle, WA, for petitioner.

Kerry W. Kircher, Office of Thrift Supervision, Washington, DC, for respondent.

Before: HUG, HALL, and THOMPSON, Circuit Judges.

HUG, Circuit Judge:

Petitioner Jess T. Simpson challenges the administrative proceeding brought against him by the Office of Thrift Supervision ("OTS"). On November 18, 1992, the Director of the OTS ("the Director") issued its final decision and order requiring Simpson to, among other things, pay restitution to Cascade Savings Bank for banking violations. Simpson timely petitioned for review of the Director's decision on December 7, 1992. The Director issued a second order on January 4, 1993, modifying the amount of restitution ordered. Simpson timely petitioned for review of the second order on January 27, 1993. The two petitions have been consolidated.

Simpson raises several challenges to the Director's decision. First, he raises three constitutional claims: 1) the separation of powers doctrine was violated by allowing a non-Article III tribunal to adjudicate his claims; 2) he was denied his Seventh Amendment right to a jury trial; and 3) he was denied procedural due process of law. Simpson also alleges that the statute of limitations bars portions of the restitution ordered. Finally, Simpson contends that the Director erred by concluding that he acted with "reckless disregard" or was unjustly enriched.

We have jurisdiction pursuant to 12 U.S.C. § 1818(h)(2). We conclude that Simpson's constitutional rights were not violated. Further, the restitution order was not barred by the statute of limitations, and the Director did not err in concluding that Simpson acted

with reckless disregard. Accordingly, we affirm.

## I.

### FACTS AND PRIOR PROCEEDINGS

Jess T. Simpson was president and chairman of the board of Cascade Savings Bank ("Cascade"), a Washington state-chartered mutual savings and loan association, from 1955 until he resigned on March 13, 1990. Following Simpson's resignation, Cascade hired K.P. Zech, of Z–Associates, Inc., to investigate Simpson. The investigation resulted in a report raising four separate claims of suspected impropriety against Simpson.

Simpson and Cascade failed to reach a settlement regarding the four claims. The OTS thereafter began an investigation of Simpson, culminating in the filing of the Notice of Charges against Simpson on February 12, 1991. Specifically, the Notice of Charges alleged that Simpson engaged in unsafe or unsound practices and "committed acts that constitute willful disregard for Cascade's safety and soundness and breaches of fiduciary duty...." The OTS sought restitution from Simpson for the alleged violations of banking practices.

The unsound practices involved a profit-sharing plan in which Simpson distributed $529,500 in profits to Cascade officers and managers, including $105,000 to himself in 1989. The 1989 final audit revealed, however, that Simpson should not have distributed any profits. The Notice of Charges also alleged that Simpson breached his fiduciary duty to Cascade when he failed to disclose certain details to the loan committee and Board of Directors when it was approving a loan ("the Previs loan") that Simpson arranged. When the borrowers later defaulted, Cascade lost approximately $328,424 on the loan. Finally, the Notice of Charges alleged that Simpson usurped Cascade's corporate opportunities by setting up an independent insurance agency, Insurance Commerce, Inc. ("ICI"), to which commissions were diverted from Cascade customers' purchase of mortgage life insurance. ICI received approximately $161,000 in commis-

sions. Simpson does not challenge the underlying merits of the Previs loan or the ICI commissions claims; rather, Simpson only asserts that the claims are partially barred by the applicable statute of limitations.

The OTS has authority to pursue cease-and-desist proceedings against an institution or an institution-affiliated party if, in its opinion, it has reasonable cause to believe that the institution or the institution-affiliated party has engaged, or is about to engage, in unsafe or unsound business practices, or is violating, or is about to violate, the law. *See* 12 U.S.C. § 1818(b)(1). At all relevant times, Simpson was an institution-affiliated party of Cascade in accordance with 12 U.S.C. § 1813(u).

The process begins when the OTS issues the Notice of Charges. *See* 12 C.F.R. § 509.18. After the notice issued, Simpson timely filed an answer. *See* 12 C.F.R. § 509.19(a). Pursuant to 12 U.S.C. § 1818(b)(1) and 12 C.F.R. § 505.5, Simpson received a hearing before Administrative Law Judge Paul Cross ("the ALJ") from August 26 to August 30, 1991. The ALJ recommended that Simpson be ordered to pay restitution for the amount Simpson distributed to himself, for the amount of the loss on the Previs loan, and for all commissions paid to ICI. In addition, the ALJ imposed a $138,013 civil penalty on Simpson.

At the conclusion of the proceedings, the ALJ filed the record of the proceedings with the Director, including the ALJ's recommended decision, findings of fact and conclusions of law, as well as any transcripts, briefs, motions, rulings, etc. *See* 12 C.F.R. § 509.38. Both parties took exception to the ALJ's recommended findings of fact and conclusions of law. The Director of the OTS reviewed the complete record and issued its final decision and order. The Director determined that Simpson acted with reckless disregard not only in distributing the profit-sharing to himself, but also when Simpson distributed profit-sharing to the other managers. The Director increased the restitution amount to $1,009,446, taking into account the entire amount of profit-sharing Simpson approved and distributed. However, the Director reversed the ALJ's civil penalty as-

sessment. After learning that Cascade's Board of Directors removed $105,000 from Simpson's account, the Director issued a second order reducing the ordered restitution by that amount. The Director's decision is reviewable by our court pursuant to 12 U.S.C. § 1818(h)(2).

## II.

### *SEPARATION OF POWERS*

■ Simpson contends that the adjudication of his case by a non-Article III tribunal violated the separation of powers doctrine provided by the United States Constitution. This claim must fail.

■ "On its most fundamental plane, the separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence." *Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537, 544 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). It is a well-settled rule that "[t]he judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III." *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 59, 102 S.Ct. 2858, 2865, 73 L.Ed.2d 598 (1981) (plurality). Article III, section 1 of the United States Constitution provides:

> The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in office.

A line of cases has developed, however, which excepts certain actions from Article III adjudication. Historically excluded from Article III adjudication are cases in territorial courts, court-martials, and cases adjudicating public rights. *Northern Pipeline*, 458 U.S. at 64–67, 102 S.Ct. at 2868–69. The only applicable exception to this case is the public rights doctrine.

Simpson asserts that his case does not involve public rights, but rather, it essentially involves masqueraded state law claims that could have been asserted by Cascade. Thus, he argues, adjudication by a non-Article III judge violated the separation of powers doctrine. We reject at the outset Simpson's claim that the OTS acted in essence on behalf of Cascade in pursuing a damages claim recoverable under common law. The OTS acted independently pursuant to its congressionally mandated authority under 12 U.S.C. § 1811 *et seq.* Accordingly, we next address whether this case involves public rights.

Although there is no bright-line rule detailing what constitutes a public rights case, the plurality of the Supreme Court in *Northern Pipeline* stated that the exception only extends to "matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,' and only to matters that historically could have been determined exclusively by those departments." *Id.* at 67–68, 102 S.Ct. at 2869–70 (citations omitted). The plurality held that Article III bars Congress from providing Article I bankruptcy courts with jurisdiction over all matters arising under the bankruptcy laws. *Id.* at 85, 87, 102 S.Ct. at 2878–79, 2880 (jurisdiction which extended to "all civil matters arising under Title 11 or arising in or *related to* cases under Title 11" was improper).

The Supreme Court later revisited the public rights exception in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). In reviewing Article III challenges, the Court noted that it weighs a number of nondeterminative factors, including "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." *Id.* at 851, 106 S.Ct. at 3257 (citations omitted). In *Schor*, the Court held that the Commodity Futures Trading Commission could entertain limited jurisdiction over state law counterclaims in reparation proceedings without violating Article III. *Id.* at 857, 106 S.Ct. at 3260.

Against this backdrop, we conclude that Simpson's case involved the adjudication of public rights, and accordingly, it did not violate Article III. Examination of the congressional scheme in light of the above factors establishes that Congress created the administrative forum to effectuate and protect the public interest.

■ The purpose of enforcement of the thrift regulation laws is to safeguard the thrift industry, the depositors, and the federal insurance fund. Simpson's claim that Cascade remained solvent at all times is inapplicable. Insolvency is not required. The unsound business practices committed by Simpson threatened Cascade's solvency by improperly dissipating its assets, thereby weakening its financial stability and undermining the interests and confidence of Cascade's depositors. Thus, the OTS instituted this action to protect those interests and to prevent and/or stop unlawful practices. By instituting the cease-and-desist proceedings, the OTS served a public purpose of the sort Congress envisioned in providing for administrative adjudication. *See Akin v. Office of Thrift Supervision,* 950 F.2d 1180, 1186 (5th Cir.1992); *Paul v. Office of Thrift Supervision,* 763 F.Supp. 568, 573–74 (S.D.Fla.1990) (enforcement proceedings under 12 U.S.C. § 1811 *et seq.* is an action to enforce public rights), *aff'd without opinion,* 948 F.2d 1297 (11th Cir.1991).

■ Finally, Congress provided adequate and meaningful judicial review by a United States Court of Appeals pursuant to 12 U.S.C. § 1818(h)(2). Thus, Simpson is entitled to, and is receiving, Article III appellate review. That Congress intended to give the OTS the power and authority to initiate and pursue enforcement *actions is clear from the* terms of 12 U.S.C. § 1818 and the accompanying regulations. This grant of authority does not violate Article III.

### III.

#### · *JURY TRIAL*

■ We review *de novo* the legal question whether Simpson was entitled to a jury trial in federal court. *Securities and Exchange Comm'n v. Rind,* 991 F.2d 1486, 1493 (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 439, 126 L.Ed.2d 372 (1993). Because we conclude that this case involves public rights, Simpson's claimed right to a jury trial must also fail.

■ The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. The Supreme Court has consistently interpreted "Suits at common law" to refer to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989). Furthermore, in cases in which " 'public rights' are being litigated,— e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible." *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 450, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 (1977).

Although this circuit has not addressed this particular issue, the Fifth and Eleventh Circuits have found that the right to a jury trial in an OTS proceeding is not violated because the OTS's action is an enforcement of public rights. *See Akin,* 950 F.2d at 1186 (5th Cir.1992) ("Where there is a proper administrative forum for adjudicating public rights, there is no right to a jury trial."); *Paul,* 763 F.Supp. at 573–74 (plaintiff claimed that OTS action was tantamount to an action for damages; court disagreed finding no Seventh Amendment violation because case involves public rights).

Simpson argues that this case is really a claim for damages and is therefore legal in nature deserving of a jury trial. Simpson's contention is unpersuasive. This case involves an order of restitution, an equitable remedy. Merely because this case involves a

claim for restitution of money does not detract from its equitable nature. *See Rind*, 991 F.2d at 1493; *see also Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir.1987) (in suing for restitution of funds milked from bank, FSLIC is pursuing an equitable remedy).

We conclude that the Seventh Amendment is inapplicable to this OTS proceeding which implicates public rights. As discussed above, Congress provided Simpson a proper administrative forum for adjudicating this action. Therefore, Simpson was not denied his Seventh Amendment right to trial by jury.

## IV.

### *PROCEDURAL DUE PROCESS*

■ Simpson contends that he was denied due process of law because his case was not decided by an independent and impartial adjudicator. He asserts that the procedural makeup of the proceedings, in which the Director of the OTS both commences the proceedings by issuing the Notice of Charges and makes the final administrative determination, is impermissible.

■ "[T]he combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975). The Court, however, may determine that special facts and circumstances in the case warrant a due process evaluation because "the risk of unfairness is intolerably high." *Id.*

Simpson's claim that the Director formed an opinion on Simpson's case before final adjudication does not stand up. Although the Director signed the Notice of Charges, the charges do not establish a personal opinion on behalf of the Director. Rather, the charges state that *the OTS,* an administrative agency, is of the opinion that Simpson violated the Savings Associations Rules and Regulations. Although the Director is the head of the OTS, his participation at the commencement of the proceedings is minimal.

A charge may not be filed until the OTS, "upon due deliberation, determines that continued service or participation by the individual may pose a threat to the interests of the association's depositors or may threaten to impair public confidence in the association." 12 C.F.R. § 508.3(a). But the issuing of charges is only the beginning of the proceedings. The Director does not investigate or prosecute the case. In fact, all interested parties are forbidden from ex parte communication with the Director. The regulation provides:

> From the time the notice is issued by the Director until the date that the Director issues its final decision ..., no party, interested person or counsel therefor shall knowingly make or cause to be made an ex parte communication concerning the merits of the proceeding to the Director, the administrative law judge, or a decisional employee.

12 C.F.R. § 509.9(b).

The system is not a perfect one. Certainly, when the Director signs the charges and thereafter makes the decision on the charges, it exudes a possible appearance of impropriety. However, there is no evidence that the Director is not an objective adjudicator. The Director signed the Notice of Charges in a quasi-judicial fashion, authorizing the institution of proceedings. The record does not establish that the Director thereafter acted as a prosecutor. The cases cited by Simpson in which a due process violation occurs if the prosecutorial and adjudicative functions are combined in one individual are inapposite. The actual prosecution of Simpson's case was handled by attorneys from the Enforcement Division of the Chief Counsel's Office who were prohibited from ex parte communication with the Director.

Furthermore, the statute provides that Simpson is entitled to a hearing before an ALJ before it reaches the Director for review. Simpson makes no claim that the ALJ was biased. It was not until after Simpson's hearing was held before the ALJ that the case came before the Director for review. On review, the Director exhibited his objectivity and neutrality by reversing the civil penalties assessed against Simpson. Finally, even after the Director made his determination on review, the case is then subject to appellate review by an Article III court.

Simpson has not established a due process violation.

## V.

### *STATUTE OF LIMITATIONS*

 Simpson contends that portions of the OTS's restitution claims are time barred. There is no federal statute of limitation specifically applicable to the OTS's action under 12 U.S.C. § 1818. If Congress has not provided an applicable statute of limitation, generally, the United States is not subject to a statute of limitation in enforcing its rights. *See Donovan v. West Coast Detective Agency, Inc.,* 748 F.2d 1341, 1343 (9th Cir.1984); *United States v. Tri–No Enters., Inc.,* 819 F.2d 154, 158 (7th Cir.1987).

Because we conclude that Congress provided no statute of limitation in OTS's rules and regulations, we hold that the OTS is not time barred in asserting the restitution claims against Simpson involving the Previs loan and the ICI commissions.

## VI.

### *SUBSTANTIAL EVIDENCE*

 Simpson's final contention is that the Director erred in ordering Simpson to pay restitution. We must sustain the Director's findings if they are supported by substantial evidence in the record as a whole. *del Junco v. Conover,* 682 F.2d 1338, 1340 (9th Cir.1982), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983); *Akin,* 950 F.2d at 1183.

Title 12 U.S.C. § 1818(b)(1) permits the OTS to issue a cease-and-desist order if an institution-affiliated party is engaging or has engaged in various proscribed activities, including engaging in an unsafe or unsound practice in conducting the business of the depository institution. An unsafe or unsound practice is one "which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds and that it is a practice which has a reasonably direct effect on an association's financial soundness." *Hoffman v. FDIC,* 912 F.2d 1172, 1174 (9th Cir.1990) (citations and quotations omitted). The OTS is given a wide range of affirmative action it may take, including ordering restitution or taking any other action it deems appropriate. *See* 12 U.S.C. § 1818(b)(6)(A–F).

The Director ordered Simpson to pay restitution. Restitution is an appropriate remedy under two circumstances: 1) if the depository institution or the party was unjustly enriched in connection with the violation or practice, or 2) if the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order. 12 U.S.C. § 1818(b)(6)(A)(i–ii). The statute does not define either "unjust enrichment" or "reckless disregard."

 In determining that Simpson acted with reckless disregard, the Director looked to the meaning of "reckless" in other statutory schemes. For the purposes of 12 U.S.C. § 1818(b)(6)(A)(ii), the Director concluded that reckless disregard for the law exists when:

> (1) the party acts with clear neglect for, or plain indifference to, the requirements of the law, applicable regulations or agency orders of which the party was, or with reasonable diligence should have been, aware; and (2) the risk of loss or harm or other damage from the conduct is such that the party knows it, or is so obvious that the party should have been aware of it.

In reviewing an agency's construction of a statute, we must reject constructions that are contrary to clear congressional intent or frustrate the policy that Congress sought to implement. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). If the statute is silent or ambiguous on a particular point, we defer to the agency's interpretation. *Id.* at 843, 104 S.Ct. at 2782.

We conclude that the Director's interpretation is a permissible construction of the statute. Applying the Director's definition of reckless disregard, we hold that substantial evidence supported the Director's decision

finding reckless disregard on behalf of Simpson in distributing profit sharing to himself and the other managers. By improperly distributing the profits, Simpson placed Cascade's financial condition at risk. This court recently found compelling the argument that restitution in an OTS enforcement action "may not only compensate an institution for past wrongs, but [it] may also serve to prevent the dissipation of assets that may belong to it, and thereby prevent prejudice to its depositors." *Spiegel v. Ryan,* 946 F.2d 1435, 1438 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992).

Simpson distributed the profit sharing pursuant to a profit-sharing plan under the Board of Directors' control. At the end of each year, one-half of all profits above the "target" were available for distribution. The 1989 target was $2 million. Simpson determined on December 31, 1989 that $529,500 would be distributed pursuant to the profit-sharing plan. From this amount, Simpson received $105,000. The remainder was distributed to 26 other Cascade officers and managers.

After Simpson's resignation, the final 1989 audit came out showing a net profit of only $918,667;[1] thus, Cascade did not even reach its target amount. Based on this audit, Simpson should not have authorized or distributed *any* profits. At the time Simpson made the distributions, Simpson contends that there was confusion as to the true financial condition of Cascade. The primary dispute was over write-downs. However, recognizing that a dispute existed over the write-downs, Simpson should not have authorized distribution of profit-sharing. At the very least, in light of the uncertainty, Simpson should have waited until the final audit to authorize distribution.

In addition, at the time of the distribution, the record establishes that Cascade was not in compliance with the Financial Institutions Reform, Recovery and Enforcement Act capital requirements. Although Cascade was working under an OTS-approved capital plan at all relevant times, Simpson was aware that any money distributed would not increase Cascade's capital position. Finally, Cascade did not meet the general loan loss reserve requirements. Although Simpson was aware that Cascade needed to have a loan loss reserve, he failed to create it prior to distributing the profit sharing. The Director concluded that Simpson breached his fiduciary duty and duty of loyalty to Cascade by engaging in activity that promoted his own interest and that could lead to a conflict of interest. We hold that the Director's decision is supported by substantial evidence.

**AFFIRMED.**

---

1. This figure does not include the profit-sharing distribution.