**Ronald J. GRUBB, Petitioner,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.**

**No. 92–9564.**

United States Court of Appeals, Tenth Circuit.

Sept. 2, 1994.

**958**

Terry W. Tippens, Greg A. Castro, Fellers, Snider, Blankenship, Bailey and Tippens, Oklahoma City, OK, for petitioner.

Ann S. Duross, Asst. Gen. Counsel, Colleen B. Bombardier, Robert D. McGillicuddy, Sr. Counsels, and Manuel A. Palau, Counsel, F.D.I.C., Washington, DC, for respondent.

Before WHITE, Associate Justice (Ret.),[**] ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Petitioner Ronald J. Grubb appeals an order issued by the Board of Directors ("the Board") of the Federal Deposit Insurance Corporation ("the FDIC") removing him as a director of the Bank of Hydro, Hydro, Oklahoma ("the Bank") and prohibiting him from participating in the affairs of any insured depository institution, 12 U.S.C. § 1818(e)(1), (7). We have jurisdiction pursuant to 12 U.S.C. § 1818(h)(2), and we affirm.

### I.

In 1981, Petitioner became the majority shareholder of the Bank and served as Chairman of the Board of Directors. As majority shareholder and Chairman of the Board, Petitioner exercised a controlling and dominant role in the Bank's lending activities. In 1985, the Bank became a source of regulatory concern due to a serious deterioration in its loan portfolio. Consequently, on November 29, 1985, the FDIC issued a cease and desist order which required the Bank, in pertinent part, to adhere to its loan policies and deny additional credit to any borrower with an uncollected loan classified as "doubtful" or a "loss." Bank examiners also requested that Petitioner remove himself from the Bank's lending activities. Thereafter, Petitioner resigned as Chairman of the Board but remained a director of the Bank.

Following the issuance of the cease and desist order, the Bank made a series of extensions of credit to Petitioner and his related business interests. The extensions of credit included: (1) a letter of credit issued to MGM Production Company ("MGM")—a company in which Petitioner held a one-third interest; (2) a loan and real estate transac-

---

[**] The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

tion involving Falcon Production Company—another business interest of Petitioner; (3) personal loans issued to Petitioner; and (4) several overdrafts in Petitioner's checking accounts at the Bank. These extensions of credit were cited by bank examiners as exceeding the Bank's legal lending limits in violation of federal banking laws and regulations and resulted in the initiation of the instant removal action. The record reveals and we briefly describe the facts of each of these extensions of credit.

### A. MGM Letter of Credit

In February 1986, Petitioner requested that the Bank issue a $265,000 irrevocable letter of credit on behalf of MGM for the benefit of Travelers Insurance Company ("Travelers"). The letter of credit backed a bond posted by Travelers as part of a lawsuit involving MGM. Petitioner personally guaranteed the letter of credit in the form of a "blank" promissory note and a "blank" guaranty agreement. On November 21, 1986, the FDIC informed Petitioner and the Bank that the letter of credit violated federal banking laws because MGM was an affiliate of the Bank and the letter of credit exceeded ten percent of the Bank's capital and surplus. Despite this warning, the Bank, with Petitioner's knowledge, issued replacement letters of credit in 1987 and 1988. Following the issuance of the 1987 letter of credit, the FDIC again informed Petitioner that the replacement letter of credit violated federal banking laws. Bank examiners also classified the letters of credit as "doubtful" based in part on Petitioner's weak financial condition.

On April 14, 1988, the Bank paid $235,801 on the letter of credit to Travelers when MGM lost an appeal in its lawsuit. At this point in time, the Bank's total extensions of credit to Petitioner and his related business interests exceeded, by $192,000, fifteen percent of the Bank's capital and surplus in violation of the Bank's lending limit. The Bank treated the $235,801 payment on the letter of credit as a loan to MGM and subsequently classified the loan as a "loss." In November 1991, Petitioner repaid the principal amount of the loan.

### B. Falcon Production Loan

On December 31, 1985, Falcon Production Company borrowed $110,000 from the Bank for the stated purpose of purchasing a mineral lease from Petitioner. Petitioner signed a promissory note and collateralized the loan with a mortgage of mineral rights on property that he owned personally. Petitioner then used the proceeds of the Falcon loan to reduce the balance of a personal loan he had at the Bank. In July 1986, bank examiners classified the Falcon loan as "substandard".

On February 12, 1987, the Bank renewed the loan to Falcon, accepting as additional collateral a second mortgage on a 479–acre farm previously owned by Petitioner.[1] At this point, the Bank's extensions of credit to Petitioner and his related business interests exceeded fifteen percent of the Bank's unimpaired capital and unimpaired surplus in violation of the Bank's lending limits.

On February 2, 1988, Falcon Production failed to make the principal and interest payments due on the loan. On February 22, 1988, the Bank took title to the farm via a deed in lieu of foreclosure and paid the first mortgage held by Equitable Life Assurance Society in the amount of $134,447. The Bank accounted for the acquired real estate by crediting the Falcon loan in the amount of $124,311 in past due principal and accrued interest and listed the property as Other Real Estate ("ORE") in the amount of $342,000. Petitioner testified he arranged the Falcon "ORE" transaction in part to allow the Bank to hold the real estate until he could reacquire it.

On February 17, 1988, five days prior to taking title to the Farm, the Bank disbursed funds to Falcon in the amount of $48,553 by depositing that amount into Falcon's account at the Bank. These funds were used to pay an overdraft which resulted when Petitioner wrote a check on the Falcon account to make payment on a personal loan at an affiliated bank. On February 22, 1988, the same day the Bank acquired the deed to the Farm, it also disbursed an additional $34,688 to Falcon, of which $34,000 was later transferred to

---

**1.** In December 1985, prior to receiving the original Falcon loan from the Bank, Petitioner transferred the farm to Falcon in exchange for a $405,000 note.

the account of Ron Grubb Investments ("RGI") at the Bank. As of February 22, 1988, the Bank's extensions of credit to Petitioner, Falcon, and MGM exceeded fifteen percent of the Bank's unimpaired capital and unimpaired surplus in violation of federal banking regulations. Moreover, Petitioner knew as of February 1988 that the FDIC believed any additional extensions of credit would violate the Bank's lending limits.

### C. Personal Loans

As well as issuing several loans to Petitioner's companies, the Bank had also issued personal loans to Petitioner in the amount of $330,000 which were subsequently classified as "substandard" in a 1985 bank examination because the loans were unsecured and Petitioner's financial net worth had declined. By April 1986, Petitioner had paid off these loans with the proceeds of the Falcon loan and a certificate of deposit which had previously secured the MGM letter of credit.

Subsequently, the Bank made four new extensions of credit to Petitioner: (1) a $75,000 loan on April 25, 1986; (2) a $150,000 loan on June 5, 1986, which was used to renew the principal and unpaid interest of the April 25, 1986 loan and to provide $73,884 in new funds; (3) a $100,000 loan on October 29, 1986, of which approximately $39,000 was used to pay Petitioner's overdrafts on another account with the Bank; and (4) a $250,000 loan on April 14, 1987, which consolidated the June and October 1986 loans. At the time these loans were made, the Bank's extensions of credit to Petitioner, MGM, and Falcon exceeded fifteen percent of the Bank's unimpaired capital and unimpaired surplus.

Following a bank examination conducted in July 1986, FDIC bank examiners informed Petitioner that the June 1986 loan exceeded the Bank's lending limits and had been adversely classified as "substandard." Thereafter, on July 23, 1986, Petitioner signed a security agreement pledging his interest in a judgment bond as security for the loan and the MGM letter of credit. Likewise, when the April 1987 loan was made, Petitioner granted the Bank additional collateral in the form of mortgages on a Texaco station in Clinton, Oklahoma and a condominium in Colorado. However, there is no indication in

the record that the Bank ever perfected any security interest in either of the properties. At the 1987 bank examination, the April 1987 loan was classified as "doubtful".

In August 1988, Petitioner ceased making payments on the April 1987 loan and the Bank charged off as a loss $10,895 in accrued but uncollected interest. In June 1989, the Bank charged off as a loss the principal balance of $248,806 but later rebooked the loan with the permission of the Oklahoma State Banking Commissioner. In June of 1991, the principal of the April 1987 loan was repaid by Petitioner.

### D. Checking Account Overdrafts

During 1986 and 1987, the Bank maintained checking accounts on behalf of Petitioner, MGM, and Falcon Production Company, and RGI. All of these accounts were overdrawn at various times between July 1, 1986 and November 30, 1987. The overdrafts constituted extensions of credit in violation of the Bank's lending limit and were not secured by acceptable collateral in violation of banking laws and regulations.

### II.

On December 22, 1988, the FDIC initiated this administrative action seeking to assess a $50,000 penalty against Petitioner for various violations of federal banking laws resulting from the Bank's extensions of credit to Petitioner and his related business interests. As early as March 1989, the parties discussed possible settlement of the assessment notice. At a pre-hearing conference held on April 13, 1989, the FDIC advised an administrative law judge ("ALJ") that subject to approval by the Board, a settlement had been reached. Under the settlement, Petitioner agreed to pay $14,000 as a penalty to the FDIC in monthly installments of $1,000. The agreement also provided that the FDIC would not use the allegations in the assessment notice in future enforcement proceedings involving Petitioner.

On July 13, 1989, the FDIC initiated the instant removal action. As a basis for removal, the FDIC alleged Petitioner had violated various banking laws, breached his fiduciary duty as a director of the Bank, and

engaged in unsafe and unsound business practices as a result of the numerous extensions of credit he received from the Bank. The FDIC further alleged that Petitioner's conduct concerning the extensions of credit demonstrated a willful or continuing disregard for the safety and soundness of the Bank. The FDIC requested that Petitioner be removed from his position as director at the Bank and prohibited from participating in the banking affairs of any insured depository institution.

Following Petitioner's receipt of the removal notice, the Board rejected the proposed settlement agreement. Petitioner then filed a "Motion to Enforce Settlement, To Dismiss or, in the Alternative, for Summary Judgment," alleging that the FDIC's removal action was barred by the doctrine of res judicata. On December 28, 1989, the ALJ denied the motion and consolidated the assessment and removal actions for a hearing.

On March 25, 1992, following the completion of an evidentiary hearing, the ALJ found that Petitioner had violated numerous federal banking laws and regulations in his business dealings with the Bank and had "often treated the Bank's resources as if they were his personal purse which he might employ without regard to regulatory constraints." Based upon these findings, the ALJ recommended the assessment of a $50,000 penalty against Petitioner. However, the ALJ recommended that the removal action be dismissed. Both parties filed exceptions to the ALJ's recommended decision. In his exceptions, Petitioner did not object to the ALJ's ruling on his motion to enforce the settlement agreement.

On review, the Board adopted the ALJ's recommendation to assess a civil penalty against Petitioner. The Board, however, rejected the ALJ's recommendation to dismiss the removal action. The Board concluded that Petitioner's conduct constituted a willful or continuing disregard for the safety and soundness of the Bank and ordered Petitioner removed from his position at the Bank and prohibited him from participating in the affairs of any insured depository institution. This appeal followed.

On appeal, Petitioner contends: (1) the Board's conclusion that his conduct concerning the extensions of credit constituted a willful or continuing disregard for the safety or soundness of the Bank is not supported by substantial evidence in the record as a whole; (2) the Board's removal order is an abuse of discretion; and (3) the FDIC's removal action is barred by the doctrine of res judicata.

### III.

Petitioner contends the Board erred in concluding his conduct concerning the extensions of credit constituted a willful or continuing disregard for the safety or soundness of the Bank. Our review of the Board's removal order is governed by § 706 of the Administrative Procedure Act ("APA"). *See* 12 U.S.C. § 1818(h)(2) (appellate review of removal proceedings "shall be had as provided" under APA). We review the Board's findings to determine whether they are supported by substantial evidence in the record. *See* 5 U.S.C. § 706(2)(E); *Sunshine State Bank v. FDIC,* 783 F.2d 1580, 1584 (11th Cir.1986). Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion. *Baca v. Department of Health and Human Services,* 5 F.3d 476, 478 (10th Cir.1993). In our review of the record as a whole, we must consider the findings of both the ALJ and the Board. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 492–97, 71 S.Ct. 456, 466–69, 95 L.Ed. 456 (1951). Furthermore, in cases in which the ALJ and the Board reach contrary conclusions, we determine whether the Board sufficiently articulated reasons for rejecting the ALJ's findings or conclusions. *Harberson v. NLRB,* 810 F.2d 977, 984 (10th Cir.1987).

The FDIC may seek an order removing a person from participating in the banking industry upon a showing that the person: (1) violated the law, (2) the violation caused either losses to the bank or financial gain to the perpetrator, and (3) the violation constituted a willful or continuing disregard for the safety and soundness of the bank. *See* 12 U.S.C. § 1818(e)(1). "Willful disregard" and "continuing disregard" present two alternative standards for removal. *Brickner v. FDIC,* 747 F.2d 1198, 1202 (8th Cir.1984). "Willful disregard" has been de-

fined as deliberate conduct which exposed the bank to "abnormal risk of loss or harm contrary to prudent banking practices." *Van Dyke v. Board of Governors of Federal Reserve,* 876 F.2d 1377, 1380 (8th Cir.1989). The Board has defined "continuing disregard" as conduct which has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences." *Docket No. FDIC–85–215e,* 1986 F.D.I.C. Enf.Dec. (P–H) ¶ 5069 at 6741.

In the instant case, the ALJ concluded Petitioner's conduct did not amount to a willful or continuing disregard for the safety and soundness of the Bank. In so concluding, the ALJ found that Petitioner's repeated violations of federal and state banking laws were a result of his financial inability to repay the extensions of credit. Moreover, according to the ALJ, becoming financially unable to repay a loan did not constitute "deliberate" or even "voluntary" conduct demonstrating a lack of regard for the Bank's safety or soundness. The ALJ further concluded that Petitioner had not deliberately imposed a loss or risk of loss on the Bank. Finally, noting that removal was a matter of discretion with the Board, the ALJ found that Petitioner had not engaged in similar conduct in the five other banks controlled by him and that Petitioner possessed invaluable skills and expertise which the industry could "ill-afford to lose." Based on these factors, the ALJ concluded Petitioner's conduct did not constitute a willful or continuing disregard for the Bank's safety and soundness and recommended that the removal notice should be dismissed.

On review, the Board rejected the ALJ's conclusion that Petitioner's conduct involving the extensions of credit did not constitute a willful or continuing disregard for the safety and soundness of the Bank. Rather, the Board found that as majority shareholder, Petitioner obtained several extensions of credit for his personal or business use which constituted unsafe and unsound banking practices, a breach of fiduciary duty, and exceeded the Bank's lending limits as provided for under federal banking laws and regulations. The Board further found that following bank examinations from 1986–88, Petitioner was repeatedly informed that the extensions of credit violated federal and state

banking laws and was admonished to correct the violations. Despite these warnings, Petitioner continued to receive funds from the Bank.

Contrary to the ALJ's conclusion, the Board found that the repetitive nature of the violations should not be excused merely because Petitioner became financially unable to repay the loans. Rather, because Petitioner's ability to repay the extensions of credit "was in serious question at the time [they] were first made" in 1985 and 1986, the Board concluded Petitioner's inability to repay the extensions of credit was not "a mitigating factor but an indication of his disregard for the safety and soundness of the Bank in obtaining the extensions of credit in the first instance."

The Board also rejected the ALJ's conclusion that the repetitive nature of the violations should be excused merely because Petitioner pledged collateral to secure the extensions of credit and thus evidenced "positive action to insure the Bank's safety and soundness." Rather, the Board noted that nearly all of Petitioner's pledges of collateral were made only in response to repeated criticisms and warnings by federal or state banking regulators. Under these circumstances, the Board concluded Petitioner's pledge of collateral did not constitute "positive action to insure the Bank's safety and soundness."

The Board also rejected the ALJ's conclusion that Petitioner did not deliberately impose a loss on the Bank. Rather, the Board concluded that the Bank suffered actual losses as a result of the MGM Letters of Credit, Petitioner's personal loans, and the Falcon Production loan and ORE transaction. Also, the Board found that the risk of loss to the Bank which resulted from the Falcon Production ORE transaction was deliberately imposed by Petitioner.

Finally, the Board held that Petitioner's conduct at his other banks was irrelevant in determining whether his conduct demonstrated a willful or continuing disregard for the safety or soundness of the Bank. The Board rejected the ALJ's conclusion that Petitioner's extensive banking experience should be considered a mitigating factor, concluding that the scope of Petitioner's experience "[made] his participation in prohibited

activities all the more reprehensible." Based on these findings and conclusions, the Board determined Petitioner's conduct concerning the extensions of credit constituted a willful or continuing disregard for the safety and soundness of the Bank.

■ Upon careful review of the findings and conclusions of both the ALJ and the Board, and our independent review of the record, we conclude the Board's finding that Petitioner's conduct constituted a willful or continuing disregard for the safety and soundness of the Bank was supported by substantial evidence in the record as a whole. The record indicates that between 1986 and 1988, Petitioner received several extensions of credit from the Bank in violation of the Bank's lending limits. Moreover, bank examiners informed Petitioner during this period that the extensions of credit exceeded the Bank's lending limits in violation of banking laws and regulations, and admonished Petitioner to cease and correct the violations. Despite these admonishments, Petitioner continued to received extensions of credit from the Bank. Although Petitioner repaid some of these extensions of credit, the extensions when made exposed the Bank to an abnormal risk of loss. From this evidence, the Board could reasonably conclude that Petitioner's conduct was deliberate and exposed the Bank to an abnormal risk of loss and thus evidenced a willful disregard for the safety or soundness of the Bank. *See Van Dyke*, 876 F.2d at 1380. Moreover, from this evidence, the Board could also conclude that Petitioner's conduct had been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences," *Docket No. FDIC-85-215e*, 1986 F.D.I.C. Enf.Dec. (P-H) ¶ 5069 at 6741, and thus evidenced continuing disregard for the Bank's safety or soundness. We also conclude the Board adequately explained its rejection of the ALJ's findings.

## IV.

Petitioner next argues the Board abused its discretion in removing him as a director of the Bank and prohibiting him from further participation in the affairs of any insured depository institution. Specifically, Petitioner contends his removal is unwarranted because: (1) the record as a whole does not support a finding that his conduct constituted a willful or continuing disregard for the safety or soundness of the Bank, and (2) lesser enforcement measures such as the cease and desist order, and his voluntary actions were adequate to remedy his violations of federal banking laws and regulations.

■ We review the Board's imposition of a removal sanction for an abuse of discretion. *See Brickner v. FDIC*, 747 F.2d 1198, 1203 (8th Cir.1984). The Board abuses its discretion when it imposes a removal sanction which " 'is unwarranted in law' or 'without justification in fact.' " *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973).

We first conclude the Board did not abuse its discretion in removing Petitioner from his position as a director of the Bank. This is so because, as stated *supra* Part III, there is substantial evidence in the record to support the Board's finding that Petitioner's conduct constituted a willful or continuing disregard for the Bank's safety and soundness.

We likewise reject Petitioner's contention that lesser enforcement measures such as the cease and desist order and his voluntary removal from the Bank's lending activities were adequate to remedy his statutory violations. We first note that many of the statutory violations concerning the extensions of credit occurred during the period when the Bank was subject to an existing cease and desist order issued by the FDIC. Moreover, although Petitioner removed himself from the Bank's lending activities, the record indicates that Petitioner continued to originate many of the loans and checking account overdrafts which resulted in numerous violations of federal banking laws and regulations. Under these circumstances, the Board could have reasonably concluded that lesser enforcement actions and Petitioner's voluntary removal from the Bank's lending activities were ineffective and that a removal sanction was appropriate.

■ Having concluded the Board did not abuse its discretion in removing Petitioner as a director of the Bank, we also conclude the Board did not err in prohibiting Petitioner from participating in the affairs of any in-

sured depository institution. Indeed, once it removed Petitioner as a director of the Bank, it was *required* to impose an industrywide prohibition. *See* 12 U.S.C. ·§ 1818(e)(7) (a person who has been removed from office in an insured depository institution "may not ... participate in any manner in the conduct of the affairs of any insured depository institution").

## V.

■ Finally, Petitioner contends the doctrine of res judicata bars the FDIC's removal action because the terms of a settlement agreement prevented the FDIC from bringing a removal action against him. We conclude this argument is precluded from appellate review.

The regulations governing the practice and procedure before the Board provide that a party's failure to file written exceptions to the ALJ's findings or to take exception to the ALJ's "failure to make a ruling proposed by a party" within thirty days of serving the recommended decision constitutes a waiver of an objection. *See* 12 C.F.R. § 308.39(a)–(b). "An objection not raised with the agency within the time limits is precluded from appellate review except in exceptional cases when injustice will result." *Burke v. Board of Gov. of Federal Reserve System,* 940 F.2d 1360, 1365 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1957, 118 L.Ed.2d 559 (1992).

In the instant case, the record indicates that Petitioner filed a "Motion to Enforce Settlement, To Dismiss or, in the Alternative, for Summary Judgment" before the ALJ. In the motion, Petitioner argued that the parties had entered into a binding settlement agreement which prevented the FDIC from bringing a removal action. Thus, Petitioner claimed the removal action was barred by the doctrine of res judicata. At a pre-hearing conference, the ALJ denied the motion. Petitioner did not raise an exception to the ALJ's ruling as to the res judicata issue before the Board within the time limits specified by the regulations. Therefore, the Board was never presented with Petitioner's res judicata issue. Moreover, no injustice will result from our failure to consider the claim because there was no binding settle-

ment agreement in effect because the settlement was never approved by the Board. Thus, Petitioner's claim is precluded from appellate review. *See id.* (finding a party's failure to object before the Board to the ALJ's pre-hearing ruling on a motion to sever precluded appellate review).

AFFIRMED.