# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3109

ROBERT MICHAEL and GEORGE MICHAEL, individually
and as affiliated parties of CITIZENS BANK AND
TRUST COMPANY OF CHICAGO, ILLINOIS,

*Petitioners*,

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Respondent.*

On Petition for Review of an Order of the
Federal Deposit Insurance Corporation.
Nos. FDIC-03-106e & FDIC-03-107k.

ARGUED APRIL 2, 2012—DECIDED JULY 18, 2012

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The Federal Deposit Insurance
Corporation (FDIC) brought this case against brothers
George and Robert Michael, former owners, directors,
and in the case of Robert, officer of Citizens Bank and
Trust Company (Citizens Bank), seeking a prohibition

order to prevent them from participation in the affairs of any insured depository, 12 U.S.C. § 1818(e)(7), and civil penalties, 12 U.S.C. § 1818(i), for violations of Federal Reserve regulations, breaches of their fiduciary duty, and unsafe and unsound practices. After an extensive evidentiary hearing before an administrative law judge (ALJ) spanning over more than six days with a total of seventeen witnesses and numerous documents, the ALJ issued a 142-page decision with detailed findings showing that the Michaels engaged in insider transactions and improper lending practices and recommending that the FDIC Board issue a prohibition order and civil penalties. The FDIC Board adopted the ALJ's findings and affirmed the decision. The Michaels filed this petition for review.

The Michaels take great pains to explain the convoluted, overlapping, and seemingly oblique transactions that gave rise to the FDIC Board's removal order. What seems to be lost on the Michaels in this appeal is that we afford great deference to the trier of fact when making credibility determinations and weighing conflicting evidence. The Michaels urge us to overturn numerous adverse credibility determinations and draw inferences from the record in a way that paints a picture of legitimacy despite the Board's contrary determinations. That is not our role as an appellate court. Because the large, voluminous record in this case, thoroughly analyzed by the ALJ and Board, contains substantial evidence to support the Board's decision, we affirm.

## I. FACTS

George and Robert formed Citizens Financial Corporation (CFC), which later became Citizens Bank's holding company. Citizens Bank opened in January 2000; the Michaels were Citizens Bank's principal shareholders. George was a director and Robert was chairman and chief executive officer. Citizens Bank, as an insured state non-member bank, *see* 12 U.S.C. § 1813(e)(2), was supervised by the FDIC, subject to the Federal Deposit Insurance Act (FDIA), *see* 12 U.S.C. § 1811-1831, and the regulations thereunder, and to the laws of the state of Illinois.

Within months of Citizens Bank's opening, the FDIC and Illinois Office of Banks and Real Estate (OBRE) conducted a joint exam identifying a number of regulatory problems, including concerns about "abusive insider transactions," insiders exceeding "their individual lending authority without obtaining the appropriate prior approvals," violations of Regulation O (12 C.F.R. Part 215) resulting "from inappropriate insider activities," lack of oversight, failure to properly document and report transactions, poor lending practices, and numerous other administrative shortcomings. The OBRE issued a cease-and-desist order finding that the bank was being operated with insufficient supervision, detrimental policies, hazardous lending and collection practices, inadequate record-keeping and controls, and otherwise in an unlawful manner. Citizens Bank was instructed, among other things, to refrain from engaging in unfair and unsound practices and approving loans to insiders without prior full disclosure.

In response, in December 2000, Citizens Bank replaced its president, Nicolas Tanglis, with James Zaring, an experienced bank officer. Tanglis remained with Citizens Bank as Vice Chairman until August 2003. The Michaels also hired Benjamin Shapiro, a former FDIC regional counsel, as the bank's counsel to provide regulatory advice. Citizens Bank, upon Shapiro's suggestion, hired Joseph Gunnell, a former bank examiner, as a consultant to oversee continued compliance with FDIC regulations and the cease-and-desist order. Citizens Bank's CAMEL rating—a bank-rating system designed to measure a bank's soundness—eventually improved, but the Michaels' questionable practices did not.

The FDIC brought charges against the Michaels based on three transactions: (1) the Harvey Hospitality loan transaction; (2) the double pledging of a stock certificate; and (3) the Galioto-Irving property transaction. The FDIC urged that the Michaels' complicity in any one of these transactions was alone sufficient to support removal.

A.  Harvey Hospitality Loan Transaction

In the fall of 2000, Robert was approached about buying Harvey Hotel, a distressed property in need of substantial repairs. Robert, who testified that he had no interest in owning the hotel, suggested to a business acquaintance, Satish Gabhawala, that the hotel could be purchased cheaply and "flipped" to other investors for quick profit. Gabhawala told Robert he did not have enough money to purchase the hotel, but Robert responded that he would "take care of the financing." Gabhawala arranged

for his mother and brother to form Big 2 Trading Corpora-
tion to acquire the hotel with the plan of selling it at a
higher price to Harvey Hospitality, a company formed
by Big 2 and a group of outside investors (the Patels) to
own and manage the hotel.

Gabhawala (after consultation with Robert) negotiated
a price of $2.25 million for the hotel, but was unable to
obtain financing to pay that amount in time for closing.
The closing date was extended twice, increasing the
purchase price to $2.58 million and jeopardizing the
sale. Robert and George stepped in and borrowed the
money for Gabhawala in what the Michaels testified
was a "short-term bridge loan." First Bank and Trust
Company agreed to lend the Michaels $1.4 million with
the hotel as collateral. Even with the First Bank loan, the
escrow deposits of Big 2, and the Patels' investment,
there was still a $700,000 shortfall.

In December 2000, the Michaels applied for a loan from
Citizens Bank for the $700,000. The Michaels discussed
the loan and their interest in Harvey Hotel at Citizens
Bank's December 13, 2000, board meeting. The bank's
board of directors declined a loan for the full amount
after determining that it would exceed lending limits to
"insiders" under Regulation O.[1] Robert and George were

---

[1] The restrictions of Regulation O (save a few exceptions) have
been made applicable to state nonmember banks by 12 U.S.C.
§ 1828(j)(2) and 12 C.F.R. § 337.3(a). The record reveals that the
board may have been willing to lend up to $600,000 to the
(continued...)

able to obtain the $700,000 loan from United Trust Bank. The Michaels, in a memo dated December 31, 2000, informed Citizens Bank's board of directors that they had secured a $1.4 million loan from First Bank and a $700,000 loan from United Trust for the purchase of the Harvey Hotel. The memo stated that "[i]t is anticipated that th[ese] loan[s] will be repaid with proceeds of a sale planned to consummate prior to 31 March 2001."

The closing on Harvey Hotel occurred on December 20, 2000, and the property was conveyed to Big 2. At closing, Robert received an excess proceeds check in the amount of $513,600, which he deposited into an escrow account in the name of R&G Properties, the Michaels' primary real estate business, a portion of which was used to rehabilitate the hotel. Big 2 quitclaimed the hotel personal property to the Michaels and deeded the hotel real property to a land trust with the Michaels as sole beneficiaries. The Michaels and Harvey Hospitality executed an Installment Agreement for Deed (Installment Agreement) and an Asset Purchase Agreement to transfer the real and personal property to Harvey Hospitality for a purported purchase price of $3.95 million: $2.58 million for the real property and $1.365 million for the personal property. (The only explanation for

---

[1] (...continued)
Michaels pursuant to Regulation O. As an executive officer, Robert could obtain a $100,000 loan. *See* 12 C.F.R. § 337.3(c)(2). George, as a director, could possibly borrow up to $500,000, and more by complying with certain approval requirements. *See* 12 C.F.R. § 337.3(b); 12 C.F.R. § 215.4(b).

this rapid increase in purchase price was to provide Gabhawala with a promoted equity interest in the hotel.) An amendment to the Asset Purchase Agreement reduced the personal property purchase price. The Installment Agreement required monthly installments of $60,600 beginning February 1, 2000 (to pay the interest on the First Bank and United Bank loans), and $2,585,000 (plus taxes) at closing scheduled for April 2, 2001. The Michaels quitclaimed the personal property to Harvey Hospitality immediately without payment.

Gabhawala testified that Harvey Hospitality did not make the monthly payments under the parties' Installment Agreement. Robert, however, took money out of a Harvey Hospitality account (despite Gabhawala's objections) and purportedly credited this amount against the outstanding debt. Harvey Hospitality was also unable to secure financing for the hotel to pay the purchase price, a problem for the Michaels because their First Bank and United Trust loans were set to mature in June 2001.

In May 2001, Harvey Hospitality applied for a $2.9 million loan from Citizens Bank, representing that the purchase price was $3.95 million. The Michaels and three other bank directors signed the loan approval sheet dated May 7. The remaining two directors were unavailable. Zaring testified that the Harvey Hospitality loan was approved at the May 30 board meeting, but the meeting minutes do not reflect this vote. The meeting minutes also do not reflect that the details of the loan were discussed, nor do they reflect disclosure of the Michaels'

interest in the loan, the artificially inflated purchase price, or Harvey Hospitality's default under the Installment Agreement. The meeting minutes merely state that the board members discussed the final stage of the loan request and gave the projected date for the closing.

Conflicting testimony was presented as to what the board members knew about the transaction. Zaring testified that he knew Harvey Hospitality was purchasing the property from the Michaels and that everybody knew the Michaels were getting the funds to pay their loans. (This testimony is supported by the Michaels' December 13 memo to the board discussing their acquisition of the hotel.) Shapiro also testified that the board members were informed that the hotel was being flipped. Zaring and others in attendance, however, could not recall being informed that the hotel was originally purchased for $2.58 million or that the full purchase price was not being paid.

According to Zaring, the Michaels were in attendance when the board discussed approval of the loan. Shapiro, Tanglis, and the Michaels, on the other hand, testified that the Michaels left the room. The meeting minutes do not reflect that they left. The ALJ credited Zaring's testimony (at least in this respect) and found Shapiro's and Tanglis' testimony unpersuasive and unbelievable. The lack of any meeting minutes discussing the details of the Harvey Hospitality loan, the ALJ found, was telling.

Regulators in 2000 admonished Citizens Bank to keep accurate and complete minutes of their meetings and it appeared that the directors had been heeding this instruc-

tion in prior board meetings. Shapiro and Gunnell had also informed the directors a few months earlier that an extension of credit to an "insider" invokes Regulation O requirements and therefore, the details of the meeting must be reflected in the board's minutes. They also informed the directors that "insiders" must abstain from discussion and voting on the loan and the minutes must reflect their abstention. Accordingly, because the meeting minutes were lacking, the ALJ found that the Michaels participated in the vote and failed to inform the board of directors of their interest in the loan or other unfavorable details about the deal.

Citizens Bank made the loan, but dispersed only $2,389,000. The Michaels received approximately $2.1 million at closing to pay off their First Bank and United Trust loans. The Michaels, however, worked out a restructuring agreement with United Trust to only pay down a portion of that loan at the time. Robert received an excess check of $55,000, which according to him was for payment due under the Installment Agreement.

## B. Double Pledging of Stock Certificate

The Michaels pledged two stock certificates to United Trust as security for their $700,000 loan. One of those certificates—certificate #3—had already been pledged to Mount Prospect Bank in July 1999 as security for two unrelated loans that were renewed in December 2000 (just two weeks before certificate #3 was pledged to United Trust). George owned certificate #3, which represented 35,440 shares of Citizens Bank and had a book value of $1,063,200.

The Michaels presented evidence that Tanglis was solely responsible for securing the Mount Prospect loan. George testified that he had delivered certificate #3 to Robert and was unaware that it had been used as collateral for the Mount Prospect loan even though he signed loan documents listing the stock certificate as collateral. Tanglis testified that he mistakenly assumed that Mount Prospect held only Robert's certificate #2.

When Tanglis could not find certificate #3 to pledge for the Union Trust loan (Mount Prospect had it), Robert instructed him to "make another one." Robert signed the duplicate certificate (which had no markings to indicate it was a duplicate) and turned it over to United Trust as collateral. George signed the United Trust loan documents dated December 20, 2000, but testified that he was not otherwise involved with the loan application or transaction and had no awareness of the duplication of his certificate. The Michaels warranted that they owned the collateral "free and clear of all security interests, liens, encumbrances and claims of others," that they had the right to pledge the collateral, and that the collateral had not otherwise been encumbered. They also agreed that they would keep United Trust's "claim in the property ahead of claims of other creditors." Similar warranties had been made to Mount Prospect.

Robert testified that he first discovered the double pledge when he applied for a loan with Cole Taylor Bank around March 2001. He asked Zaring to contact Union Trust about substituting new collateral in exchange for the release of duplicate certificate #3. Zaring discussed

the matter with United Trust and at that time, presented a second mortgage encumbering Citizens Bank as a collateral swap. According to Zaring, he informed Robert that United Trust needed to take the request for release to United Trust's board of directors but presumed it would be granted.

United Trust, however, did not release certificate #3. In fact, in June, the Michaels signed a one-page debt modification agreement on the $700,000 United Trust loan listing certificate #3 as collateral. A month later, the Michaels pledged certificate #3 as collateral on the Cole Taylor loan, making similar representations and warranties as in their other transactions with respect to the collateral. Cole Taylor did not receive certificate #3 until August 2001. The Michaels drew on the Cole Taylor line of credit to pay down one of the Mount Prospect loans, prompting Mount Prospect to release original certificate #3 to Cole Taylor. In September, the Michaels again signed an agreement securing a United Trust loan with the same collateral.

The Michaels ultimately defaulted on the United Trust loan, resulting in a foreclosure action, before eventually paying it in full. The president of United Trust subsequently submitted a letter stating that the collateral provided by the Michaels without regard to the certificate was sufficient to secure the outstanding balance of the loan.

In the summer of 2002, the FDIC discovered the double pledge during an examination of Citizens Bank. Subsequently, the Illinois Commissioner of Banks and Real

Estate entered an order of prohibition against Tanglis
and found that he failed to notify George that he had
created a duplicate of his certificate.

### C.  The Galioto-Irving Property Transaction

In the summer of 2001, a real estate agent contacted
George about purchasing an unoccupied building on
West Irving Park in Chicago (Irving property) that was
in foreclosure and located next door to an office
building the Michaels owned. George subsequently
entered into a contract with Bank One to purchase the
property for the low price of $210,000. Before closing,
Bank One gave George access to the property to begin
repairs. George spent about $100,000 on renovations
and rented out the space through Michael Realty. In the
spring of 2002, Bank One was finally ready to close on
the transaction, whereby Bank One would transfer the
note, mortgage, and assignment of rents to the Michaels
(or their assignee), who would then substitute Bank One
in the foreclosure action. The Michaels, however, could
not get the funds necessary to close on the property
and were unable to close on three scheduled dates.
Bank One warned that it was withdrawing its offer. The
Michaels scrambled to find financing.

Earlier, Robert had approached John Galioto, a business
acquaintance and friend, seeking capital for Citizens
Bank. Galioto told Robert that he did not have cash to
contribute, but offered an unencumbered residential
property that he owned on Vogay Lane (Vogay property).
At the time, Galioto had several loans in process at

Citizens Bank. Galioto had also taken over management of the food and beverage operations at Harvey Hotel.

Around the time the Michaels received notice of Bank One's intention to withdraw its offer, Robert's assistant asked Galioto to sign certain Citizens Bank loan documents. Galioto testified that he believed they were related to the refinancing of one of his properties. But instead, according to Galioto, he unknowingly signed a $216,000 promissory note for a line of credit secured by the Vogay property. The line of credit was approved by Citizens Bank board of directors; the Michaels did not inform the board that they had any interest in the property.

Galioto testified that he did not read the loan documents—some were just blank and he was simply given the signature page of others; the documents included a commitment letter, a promissory note, a mortgage, and an assignment of rents related to the Vogay property, in addition to a HUD 1 statement. Among the documents was also a purported blank authorization for draws on the credit line, one of which was later filled out (based on Zaring's directive) to authorize a $210,000 draw. Galioto testified that he did not receive any of the proceeds from this draw. The $210,000 was instead paid to Bank One for the Irving property along with a $6,000 check from R&G Properties. The Irving property was sold to R&G Properties (the Michaels' company), and R&G Properties was substituted in the foreclosure action.

The Michaels held the note and mortgage on the Irving property for over four months. They managed the property, paid the utilities, collected the rents, and deposited

the money into R&G Properties' bank account. Galioto had no involvement with the property. He testified that in October 2002, Robert asked him to sign a sublease for Harvey Hotel, as well as some other documents. Among those documents, unbeknownst to Galioto, were assignments of the mortgage and promissory note for the Irving property to Galioto.

Galioto subsequently signed a motion to substitute in as a party in the Bank One foreclosure proceeding. Galioto testified that he did not recall the document. He also admitted signing a document accepting an assignment of the Bank One loan documents but explained that he signed the document in the dark and did not know what he was signing. Galioto obtained legal title to the property in November 2002.

R&G Properties continued to manage the property, pay for utilities and insurance, and collect rents. In July 2003, George drew up a sales contract for the property, listing Galioto as the seller, the Michaels as the purchasers, and the purchase price as $400,000. Galioto testified that Robert went to his house and induced him to sign the contract by representing that the document would be used to help Robert in a bidding war. Galioto testified, "He told me that he was in a bidding—he was trying to buy a building and he just needed another bid that would be lower than the bid he was putting on for this building. So I was very tired. He said, John, just sign it, don't worry about it, you're just doing me a favor and that's what I did. My signature appears there and that was the premise of my signature."

According to Galioto, he discovered that Citizens Bank had a lien on the Vogay property in August 2003 when putting it up for sale. Galioto confronted Robert, and according to Galioto, Robert admitted that he had obtained a loan collateralized by the Vogay property but promised to repay him within four to six weeks. Galioto ended up selling the Vogay property and paying off the line of credit.

In the meantime, George proceeded to arrange financing for the sale of Irving property by obtaining a $320,000 loan from First Commercial Bank. The Michaels did not disclose to First Commercial that they had an existing business and personal relationship with Galioto, that the purchase price was not negotiated, or that they had originally purchased the property for half that amount. Galioto (unaware of the sale) did not show up at the closing and so, George signed his name to the deed. The title company issued a check to Galioto for $214,000 and the remainder (most anyway) to R&G Properties and George. Galioto testified that he had no awareness of the Irving property transaction until he obtained the $214,000 check along with a document listing the property.

Not surprisingly, the Michaels have a very different account of the events leading to the Vogay property credit line. According to them, in the spring of 2002, Robert asked George to walk away from the purchase of the Irving property because Galioto wanted to buy it. Galioto sought to buy the property, Robert testified, so that they could develop it together. Another witness testified that

Galioto told her he was going to develop the property on Irving Park Road with his banker (presumably Robert). Galioto denied this conversation took place. Robert's assistant testified that she explained to Galioto the contents of the promissory note and other loan documents he signed. She also testified that Galioto regularly paid on the Vogay line in cash. (Six cash payments of $1,500 were made on the loan.) The ALJ did not credit this testimony.

## II. ANALYSIS

The Administrative Procedure Act, 5 U.S.C. § 706, governs our review. *See* 12 U.S.C. § 1818(h)(2). We will set aside the Board's findings only if unsupported by substantial evidence on the record as a whole. *See Grubb v. FDIC*, 34 F.3d 956, 961 (10th Cir. 1994). Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion. *Id.* The Board's inferences and conclusions drawn from the facts are entitled to deference. *See Nat'l Steel Corp. v. NLRB*, 324 F.3d 928, 931 (7th Cir. 2003). Credibility determinations should not be overturned "absent extraordinary circumstances," such as "a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony, or acceptance of testimony which on its face is incredible." *Cent. Transp., Inc. v. NLRB*, 997 F.2d 1180, 1190 (7th Cir. 1993).

We will set aside the Board's legal conclusions only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also*

*Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000). The Board is entitled to discretion in imposing sanctions against violators. *See Grubb*, 34 F.3d at 963. The Board abuses its discretion only when it imposes a sanction that "is unwarranted in law" or "without justification in fact." *Id.* We cannot simply "substitute our judgment for that of the FDIC." *Lindquist & Vennum v. FDIC*, 103 F.3d 1409, 1412 (8th Cir. 1997); *see also Brickner v. FDIC*, 747 F.2d 1198, 1203 (8th Cir. 1984) ("The relation of remedy to statutory policy is peculiarly a matter for the special competence of the administrative agency."). Although we focus on the Board's decision; "as a practical matter, we look to the ALJ's opinion on issues where the Board affirmed without additional comment." *Loparex LLC v. NLRB*, 591 F.3d 540, 545 (7th Cir. 2009).

## A.  Prohibition Order

Congress has provided the FDIC Board with the authority to ban bank officers and directors from participation in the operation of a federally insured depository institution when the bankers' actions threaten the integrity of the industry. The Board imposed that harsh sanction here after concluding that the Michaels engaged in repeated acts of self-dealing and unsafe and unsound banking practices. The Board found, upon adopting the ALJ's findings, that a common theme emerges when examining all three interrelated, complicated, and overlapping transactions: "Respondents exploited their positions as Bank directors, deliberately overstated the value of assets, and concealed their true financial interest to

entice lenders and investors to fund their business ven-
tures." The Michaels' complicity in any one of these
transactions, the Board found, was sufficient to
support removal. For the following reasons, we agree.

Section 1818(e)(1) authorizes the Board to permanently
remove an "institution-affiliated party" (bank officer,
director, employee, or controlling shareholder, *see*
§ 1813(u)) and prohibit that person from returning to the
banking industry if (1) the person, either directly or
indirectly, violated a law, rule, or regulation, participated
in an unsafe or unsound banking practice, or breached
his fiduciary duty; (2) as a result of this conduct, the bank
suffered or will probably suffer a financial loss or the
person received a financial benefit; and (3) the conduct
involved personal dishonesty or demonstrated a willful
or continuing disregard for the safety or soundness of the
bank. Stated more succinctly, the Board must prove (1) an
improper act, (2) that had an impermissible effect, and
(3) was accompanied by a culpable state of mind. *See
De La Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003);
*see also In re Seidman*, 37 F.3d 911, 930 (3d Cir. 1994)
(stating that the Board must show substantial evidence
of "at least one of the prohibited acts, accompanied by
at least one of the three prohibited effects and at least
one of the two specified culpable states of mind.").

### 1. Harvey Hospitality loan transaction

The Board found that the Michaels violated Regula-
tion O, engaged in an unsafe and unsound practice, and
breached their fiduciary duty by obtaining the Harvey

Hospitality loan. *See* 12 U.S.C. § 1818(e)(1)(A). Regulation O is aimed at preventing abuse of bank funds by placing limits on the ability of a bank to lend to its officers, directors, and shareholders. *See Lindquist & Vennum*, 103 F.3d at 1416 n.9. Regulation O prohibits a bank from extending credit to insiders unless (1) the loan is made on substantially the same terms as to non-insiders; and (2) the loan does not involve more than the normal risk of repayment or present other unfavorable terms. *See* 12 C.F.R. § 215.4(a)(1)*.* Loans to insiders must also conform to certain numerical limits and board approval requirements. *See generally* § 215.4(b)-(d).

Under Regulation O's tangible economic benefit rule, "[a]n extension of credit is considered made to an insider to the extent that the proceeds are transferred to the insider or are used for the tangible economic benefit of the insider." 12 C.F.R. § 215.3(f). The rule's only exception requires that (1) the bank extend credit on terms that meet § 215.4(a) and (2) the borrower use the proceeds in a bona fide transaction to acquire property, goods, or services from the insider. 12 C.F.R. § 215.3(f)(2). The Michaels concede that they received a tangible economic benefit from the loan, but argue that they fall within the exception because the loan met the requirements of § 215.4(a)(1) and they received the proceeds in a bona fide transaction.

The Michaels cannot find solace in the exception; the facts show that this was not a bona fide transaction, and instead, was a loan that involved more than the normal risk of repayment. The Michaels contend that they merely

provided a short-term bridge loan to Gabhawala and legitimately obtained the loan proceeds to retire their debt with First Bank and United Trust. This may be one way to view the evidence but as we explain below, is certainly not the only way.

Harvey Hotel was initially transferred to Big 2 (formed by Gabhawala's mother and brother) for $2.95 million. The Michaels financed the purchase through their loans with First Bank and United Trust. Big 2 immediately transferred the hotel to the Michaels, who executed an Installment Agreement to sell it back to Harvey Hospitality (formed by Big 2 and the Patels) for the purported purchase price of $3.95 million, although the Michaels never intended to obtain that amount. The Michaels transferred the personal property (originally valued in the Installment Agreement at $1.365 million) to Harvey Hospitality immediately without payment.

The Michaels fictitiously represented to at least some of its board members that the purchase price for the hotel was $3.95 million. This led to a misrepresentation of the loan-to-value ratio in the loan approval documents, which if considering the actual transaction value, was likely over or near 100 percent and thus, exceeded Citizens Bank's loan policy. Further, the Michaels did not disclose that Harvey Hospitality was in default under the Installment Agreement and was unable to secure financing elsewhere. These facts would have alerted Citizens Bank that the loan presented a "more than the normal risk of repayment," *see* 12 C.F.R. § 215.4(a)(1)(ii), such that an objective lender would not have ex-

tended credit, *see Bullion v. FDIC*, 881 F.2d 1368, 1375 (5th Cir. 1989).

The Michaels' relentless efforts to otherwise explain the Harvey Hospitality transaction as a legitimate arm's-length bona fide transaction ring hollow. Substantial evidence shows that Robert played an integral role in Gabhawala's acquisition of the hotel and the Michaels' interest in the transaction went well beyond providing a short-term bridge loan to help a business acquaintance. In the initial closing on Harvey Hotel, the Michaels obtained an excess proceeds check for $513,600, which in part was used to rehabilitate the hotel. The Michaels' company held a lease to operate the food and beverage part of the hotel. The Installment Agreement between the parties contained a fabricated purchase price, resulting in the Michaels transferring the hotel's personal property to Harvey Hospitality for nothing. The Michaels did not use the Citizens Bank loan proceeds to pay off the $700,000 United Trust loan (they restructured and paid down on the loan) even though they assert that the proceeds were meant to retire that debt. The Michaels' personal stake in the loan and hotel, failure to disclose *all* pertinent information to its board members concerning the loan's risks, and their direct involvement in the loan approval process further support the Board's finding that the Michaels are not entitled to the tangible economic benefit exception.

Regulation O required that the loan be approved by a majority of the board of directors and that the insider abstain from participating directly or indirectly in

voting. *See* 12 C.F.R. § 215.4(b)(1). The loan application was signed by five of the seven board members, but the Michaels represented two of those votes. Although the Michaels presented evidence that they left the May 30 board meeting when the actual vote took place, the ALJ acted within his authority in discrediting their evidence. Contradictory evidence shows that they did not leave the room and they undisputedly signed the May 7 loan approval sheet. Therefore, even if there had been full disclosure, they violated Regulation O by participating in the voting. In addition, the Michaels knowingly received from Citizens Bank, via the Harvey Hospitality loan, an extension of credit in excess of the limits on borrowing to insiders in violation of §§ 337.3 and 215.4.

These same facts support the Board's finding that the Michaels violated their fiduciary duties. Directors and officers owe a duty of good faith and loyalty to their bank. *In re Seidman*, 37 F.3d at 933. They should act in "good faith[,] with the care an ordinarily prudent person in a like position would exercise under similar circumstances[,] and in a manner he reasonably believes to be in the best interests of the corporation." *Id.* (citing Revised Model Business Corporation Act § 8.42). The duty of loyalty includes a duty to avoid conflicts of interests and self-dealing. *Id.* "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities." *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir.), *cert. denied by* 132 S. Ct. 96 (2011).

A fiduciary's duty of candor is encompassed within the duty of loyalty. *See De La Fuente*, 332 F.3d at 1222 ("A

person can breach a fiduciary duty by failing to disclose material information, even if not asked."). The duty of candor requires "corporate fiduciaries [to] disclose *all* material information relevant to corporate decisions from which they may derive a personal benefit." *In re Seidman*, 37 F.3d at 935 n.34 (emphasis in added) (quotations omitted). Courts have found a breach where the violater failed to disclose "everything he knew relating to the transaction." *De La Fuente*, 332 F.3d at 1222.

The Michaels engaged in self-dealing by not abstaining from voting on the loan even though they had a clear conflict of interest and by failing to disclose pertinent information necessary for the remaining board members to assess the loan's risk. It matters not that the loan was paid in full through a refinance with another bank; the concept of risk is independent of the outcome in a particular case. *See Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000).

Having found a violation of Regulation O and breach of fiduciary duty, we do not have to address whether the Michaels also engaged in an unsafe or unsound banking practice. We merely note that the same act may be both an unsafe or unsound practice and a breach of fiduciary duty. *See Kaplan v. U.S. Office of Thrift Supervision*, 104 F.3d 417, 421 & n.2 (D.C. Cir. 1997).

The effects tests is also met with respect to this transaction because the Michaels benefitted from the loan. *See* 12 U.S.C. § 1818(e)(1)(B)(iii); *see also In re Watts,* FDIC-98-046e, FDIC-98-044k, 2002 WL 31259465, at *8 (FDIC). The loan enabled them to repay their First Bank loan and

restructure their United Trust loan and resulted in them receiving a $55,000 excess check.

The FDIC also presented evidence to show that the Michaels' conduct involved personal dishonesty or demonstrated a willful or continuing disregard for the safety or soundness of the bank. *See* 12 U.S.C. § 1818(e)(1)(C). These standards of culpability require some showing of scienter. *See Landry*, 204 F.3d at 1139. The term "personal dishonesty" has been held to mean "a disposition to lie, cheat, defraud, misrepresent, or deceive. It also includes a lack of straightforwardness and a lack of integrity." *In re Watts*, 2002 WL 31259465, at *7; *see also Van Dyke v. Bd. of Governors of Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir. 1989) (accepting Board's definition of personal dishonesty which included "deliberate deception by pretense and stealth" and "want of fairness and straightforwardness" (brackets omitted)).

The Michaels' failure to disclose obvious pertinent information relating to the loan, including the fabrication of the purchase price, is enough to establish personal dishonesty. Courts have found personal dishonesty where a bank director failed to disclose to board members his business relationship with the parties obtaining the loans or that the proceeds of the loans would pass to entities he controlled. *See Hutensky v. FDIC*, 82 F.3d 1234, 1241 (2d Cir. 1996); *see also Landry*, 204 F.3d at 1139. The Michaels similarly acted untruthfully.

George attempts to escape liability by arguing that he had no involvement in the Harvey Hospitality loan

transaction. The record belies George's argument. George (along with his brother) obtained loans to finance the first purchase of Harvey Hotel when Gabhawala was unable to obtain financing. George (again along with his brother) subsequently entered into the Installment Agreement and both signed the Citizens Bank loan approval sheet. And George, with full knowledge of his stake in the transaction, did not recuse himself from voting on the loan.

At the very least, George's conduct met the alternative "willful disregard" test. *See* 12 U.S.C. § 1818(e)(1)(C)(ii). "Willful disregard" is deliberate conduct that exposes "the bank to abnormal risk of loss or harm contrary to prudent banking practices." *De La Fuente*, 332 F.3d at 1223 (quoting *Grubb*, 34 F.3d at 961-62). Citizens Bank board of directors had previously been under close regulatory scrutiny for unsound banking practices, had been admonished by the FDIC and OBRE to refrain from improper lending to insiders and to keep accurate and complete minutes of their board meetings, and had been educated by Shapiro and Gunnell about Regulation O requirements, such as the requirement to abstain from discussion and voting on insider loans. *See Grubb*, 34 F.3d at 963 (affirming the Board's conclusions that extensions of credit to bank director for his personal benefit constituted a willful or continuing disregard for the safety and soundness of the bank where director had been admonished to cease and correct such violations).

George, a bank director, cannot claim ignorance by turning a blind eye to obvious violations of his statutory

and fiduciary duties. *See Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995) (culpability standard is met where the violater evidences a willingness to turn a blind eye to the bank's interest in the face of a known risk); *see also Hutensky*, 82 F.3d at 1241 (finding that bank director's willingness to forgo any consideration of whether personally advantageous deals were consistent with his legal and fiduciary obligations was enough to establish personal dishonesty).

### 2. Double pledging of stock certificate

The FDIC argued that the Michaels engaged in an unsafe or unsound banking practice by double pledging stock certificate #3. A banking practice is unsafe or unsound if it embraces action which is contrary to generally accepted standards of prudent operation and potentially exposes the bank to an abnormal risk of loss or harm contrary to prudent banking practices. *See Van Dyke*, 876 F.2d at 1380. An unsafe or unsound practice therefore has two components: (1) an imprudent act (2) that places an abnormal risk of financial loss or damage on a banking institution. *See In re Seidman*, 37 F.3d at 932; *see also Landry*, 204 F.3d at 1138 (stating that an "unsafe or unsound practice" is one that poses a "reasonably foreseeable undue risk to the institution" (quotations omitted)).

The FDIC presented evidence through Tom Wilkes, FDIC field office supervisor, that a failure to verify collateral being pledged, as well as actually double-pledging col-

lateral, constitutes an unsafe and unsound practice. The Michaels respond that the double pledges did not result in any abnormal risk of loss to United Trust and were inadvertent. As to risk of loss, they argue that their loan with United Trust (who held the duplicate certificate) was adequately securitized without certificate #3. The United Trust $700,000 loan was originally secured by duplicate certificate #3 (valued at $1,063,200), original certificate #20 (valued at $350,000), and a second lien on certain real property owned by the Michaels (with $630,000 in equity). The Michaels presented evidence from the president of United Trust that the other collateral pledged was sufficient to secure the outstanding balance of the loan "even without Stock Certificate No. 3" and that "from a collateral and other support point of view, the Bank was never at risk of experiencing a loss."

The record, however, supports a contrary finding. United Trust did not release stock certificate #3 as collateral even when Zaring, on behalf of Robert, sought to swap the collateral. (Instead, United Trust released a second lien on the real property pledged and subsequently released certificate #20). The Board found the collateral initially pledged (without certificate #3) insufficient because the Michaels had not completed the purchase of certificate #20. The Michaels argue that they held title to the certificate but it is undisputed that payment for the certificate was not made until several months after it was pledged. The Board's conclusion that the potential for challenge to either certificate #3 or #20 presented an abnormal risk of loss to United Trust was

supported by substantial evidence, especially considering the risky nature of the collateral.

The Board also had substantial evidence to find the culpability prong of the test satisfied. The Michaels contend that the double pledging was inadvertent, but they both signed the numerous loan documents listing stock certificate #3 as unencumbered collateral on more than one loan. Before pledging it to United Trust, Robert was aware that original certificate #3 was "missing," yet without investigating its whereabouts or following CFC by-laws, he asked Tanglis to simply make a duplicate. The pledging of certificate #3 under these circumstances suffices to show, at the very least, willful disregard for the safety or soundness of United Trust. *See* 12 U.S.C. § 1818(e)(1)(C); *see also De La Fuente*, 332 F.3d at 1222.

Robert testified that when he discovered the double pledge, he asked Zaring to swap the collateral. According to Zaring, he informed Robert that although he presumed United Trust would release certificate #3, it was contingent upon approval of United Trust's board of directors. Robert never secured the duplicate certificate from United Trust or verified that it had been released. And after securing the Cole Taylor loan with certificate #3, the Michaels renewed their loan with United Trust, which listed certificate #3 as collateral. The Board, relying on the ALJ findings and credibility determinations, properly found that Robert acted with culpability.

George argues that he had no involvement in the double pledge other than signing the loan documents.

He testified that he did not read those documents and did not negotiate the loans at issue. Unfortunately for George, this argument gets him nowhere. Although inadvertence alone is not sufficient to establish culpability, recklessness suffices. *See Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1054 (9th Cir. 1994). Given his position as a bank director, his repeated failure to read loan documents and verify the collateral being pledged constitutes a continuing disregard—i.e., conduct that has been "voluntarily engaged in over a period of time with heedless indifference to the prospective consequences," *Grubb*, 34 F.3d at 962; *see also Brickner*, 747 F.2d at 1203 & n.6—for the safety or soundness of the banks.

But even accepting that George was not culpable for either the Harvey Hospitality transaction or double pledge, he was directly and personally involved in the Galioto-Irving property transaction, which as we find below, subjects him to removal just the same.

### 3. The Galioto-Irving property transaction

The final transaction subjecting the Michaels to removal involves the acquisition of the Irving property. The court found that the Vogay credit line used to purchase the property was a nominee loan in the name of Galioto for the benefit of the Michaels. We agree with the Michaels that Galioto's testimony that he signed numerous documents on several different occasions relating to the transaction without reading any of the documents or knowing what he was signing is a hard

sell. But the ALJ credited his testimony and credibility determinations should not be overturned "absent extraordinary circumstances." *Cent. Transp.*, 997 F.2d at 1190. We do not need to decide whether extraordinary circumstances exist here because the evidence *at best* shows that Galioto was knowingly a nominee borrower for the Michaels.

The Michaels were the true borrowers on the loan. The evidence shows that the Vogay line of credit (although in Galioto's name) was used to benefit the Michaels in their acquisition of the Irving property. A loan officer breaches his fiduciary duty when making loans to a straw or nominee borrower for his exclusive use and benefit. *See In re Candelaria*, FDIC-950-62e, 1997 WL 211341, at *4 (FDIC). Nominee loans are illegal if they are used to deceive a financial institution about the true identity of a borrower. *See United States v. Waldroop*, 431 F.3d 736, 741 (11th Cir. 2005); *see also United States v. Weidner*, 437 F.3d 1023, 1034 (10th Cir. 2006). "[N]either a nominal borrower's knowledge about the terms of a nominee loan nor the nominal borrower's ability to pay back a nominee loan is a defense." *Waldroop*, 431 F.3d at 741.

Galioto's name never appeared in connection with the Irving property until October 2002—over four months after the line of credit was drawn. And even then, the Michaels continued to maintain control and possession of the property. The Michaels' company leased the space and collected rents, none of which were paid to Galioto. The Board had substantial evidence to find that this was a nominee loan to an insider and subject to Regulation O's prior approval requirements because it exceeded

the aggregate lending limits for insiders. *See* 12 C.F.R. § 337.3(b). The Michaels' failure to abstain from voting on approval of the loan and failure to disclose their interest in the loan proceeds violated their fiduciary obligations and Regulation O.

The sale of the property back to the Michaels supports the conclusion that they were the true borrowers on the Vogay credit line. The Michaels had Galioto sell the property back to them for the non-negotiated price of $400,000—almost $200,000 more than the initial purchase price even though only $100,000 worth of repairs had been made. Galioto received $210,000 from the loan proceeds as, the Board found, reimbursement for the Michaels' use of the Vogay credit line. The Michaels retained most of the remaining proceeds from the loan. Galioto never received the earnest money listed in the purchase agreement (originally $40,000, increased to $100,000 at closing); the Michaels contend that this was for reconciliation of debts, but documents do not support this claim and Galioto testified, credibly the ALJ found, that he did not owe the Michaels any money at the time.

We have no difficulty concluding that substantial evidence in the record supports a finding that the Michaels violated their statutory and fiduciary duties by obtaining the Vogay credit line through a nominee loan. We therefore do not need to decide whether they also engaged in unsound and unsafe banking practices by failing to properly disclose certain aspects of the transaction to First Commercial.

George attempts to argue that he had no active role in the Galioto loan. We simply fail to see how George's approval of the Vogay credit line, his participation in the closing where R&G Properties acquired the Irving property, his drafting of the real estate sales contract transferring the property from Galioto to the Michaels for the non-negotiated price of $400,000, and his participation in closing the First Commercial loan where he signed Galioto's name to the deed, could be viewed as anything but an active role in the transaction.

B. Civil Monetary Penalties

The Board, accepting the ALJ's recommendation, also imposed modest civil monetary penalties (CMP) against the Michaels: $100,000 against Robert and $75,000 against George. First tier CMPs may be imposed for any violation of law or regulation, such as Regulation O violations. *See* 12 U.S.C. § 1818(i)(2)(A). Second tier CMPs require proof of "misconduct," i.e., either a violation described in § 1818(i)(2)(A), or breach of a fiduciary duty, or recklessly engaging in an unsafe or unsound practice in connection with the bank, *see* 12 U.S.C. § 1818(i)(2)(B)(i); and "effects," i.e., either a pattern of misconduct, or conduct which caused or was likely to cause more than minimal loss to the institution, or which resulted in a gain or benefit to the participant, *see* 12 U.S.C. § 1818(i)(2)(B)(ii). A first tier CMP carries a penalty of up to $5,000 per day and a second tier CMP carries a penalty of up to $25,000 per day. *Id.*

In assessing the CMP, the ALJ considered the statutory mitigating factors found at 12 U.S.C. § 1818(i)(2)(G): the size of financial resources and good faith of the person charged; the gravity of the violations; the history of previous violations; and such other matters as justice may require. The ALJ also considered the 13-factor analysis found in the Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 45 Fed. Reg. 59,423 ("Interagency Policy"), which includes, among other factors, consideration of whether the violation was intentional, the duration and frequency of the violation, failure to cooperate with the agency, evidence of concealment, previous admonishment not to engage in such conduct, threat of or actual loss to bank, and evidence of financial gain or benefit to the participant.

The ALJ concluded that the Michaels were men of substantial means with ready access to credit. The ALJ also found that they flagrantly disregarded Regulation O restrictions, abused their management roles to further their personal financial interests, and that their inconsistent testimony evidenced a lack of good faith. The ALJ determined that their conduct exposed Citizens Bank to abnormal risks of loss and that the FDIC and state regulators had earlier warned the bank about Regulation O violations and careless record-keeping.

The Board affirmed the ALJ's assessment of penalties, explaining that the Michaels were eligible for first tier penalties that far exceeded the amounts actually imposed. The Board reasoned "that the frequency and duration

of the Michael's misconduct justify CMPs far in excess of the amount imposed," ranging in the millions of dollars. The Harvey Hospitality loan, the Board concluded, which was on the bank's books for a year and a half, alone could generate a penalty of at least $2.7 million. We find no abuse of discretion in the Board's reasoning and imposition of the relatively modest CMPs against the Michaels.

### III.  Conclusion

We conclude that the FDIC Board properly exercised its discretion in issuing a prohibition order under § 1818(e)(7) and monetary sanctions under § 1818(i) against the Michaels for their misconduct. The Board's factual findings are supported by substantial evidence, its legal conclusions are reasonable, and the remedy it has imposed is rational. We therefore deny the Michaels' petition for review.